IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| v. | § | Criminal No. **3:19-CR-00228-L-1** |
| | § | |
| **JUAN CARLOS SANCHEZ-CEJA** | § | |

## MEMORANDUM OPINION AND ORDER

Before the court is Defendant Juan Carlos Sanchez-Ceja's Motion to Suppress and Request for Evidentiary Hearing (Doc. 93), filed on February 12, 2021. An evidentiary hearing, including argument, was held on May 14, 2021. After consideration of the motion, response, supplemental briefings, evidence, and applicable law, the court **denies in part** and **grants in part** Defendant Juan Carlos Sanchez-Ceja's Motion to Suppress (Doc. 93). Specifically, the court **suppresses** any and all post-*Miranda* statements made by Defendant Juan Carlos Sanchez-Ceja at 2723 Larry Drive, Dallas, Texas, on April 3, 2019.

### I.   Factual and Procedural Background

In March 2019, the Drug Enforcement Administration ("DEA") Dallas Field Office began an investigation into a suspected drug-trafficking operation. *See* Tr. of Proceedings had on Friday, May 14, 2021, Suppression Hr'g ("Hr'g Tr.") 11. Members of the investigative team identified Co-defendant Salvador Garcia ("Mr. Garcia") as a potential drug distributor after an undercover law enforcement officer made contact with a drug distributor via telephone and DEA Special Agent Joe Patti ("SA Patti") obtained a search warrant to determine the location information associated with the telephone. *Id.* at 11-14. Using court-authorized precision location data, the investigative team identified two locations where Mr. Garcia was frequently located: 2524 Oates Drive, Dallas, Texas ("Oates Drive"), and 2723 Larry Drive, Dallas, Texas ("Larry Drive"). *Id.*

On April 3, 2019, the surveillance team observed Defendant Juan Carlos Sanchez-Ceja ("Defendant" or "Mr. Sanchez-Ceja") and Mr. Garcia enter the Larry Drive residence, which Mr. Sanchez-Ceja opened using a key in his possession, leave the Larry Drive residence together, and drive to the Oates Drive residence, where Mr. Sanchez-Ceja exited the vehicle and entered the house. *Id.* at 15-17. Mr. Garcia continued to drive down the alley behind the residence. *Id.* at 18. Other Dallas Police Department ("DPD") officers in the area followed Mr. Garcia and stopped him for a traffic violation. *Id.* At the same time, three members—SA Patti, Special Agent Billy Williams ("SA Williams"), and United States Marshals Service Senior Inspector Alex Campos ("Inspector Campos")—of the surveillance and/or investigative team approached and knocked on the front door of Oates Drive, which Mr. Sanchez-Ceja answered.[1] *Id.* at 179. Mr. Sanchez-Ceja, a non-English speaker, was alone at the residence. *See id.* 63; 85. There is a dispute as to whether the officers confronted Mr. Sanchez-Ceja with a show of force. *See* Def.'s Mot. 2; Gov't's Resp. 2. They wore bulletproof vests marked with "Police" on the front and the name of the officers' specific law enforcement agency on the back. *See* Hr'g Tr. 19. Additionally, their firearms were visible. *Id.* at 21. Mr. Sanchez-Ceja testified that one of the agent's firearm was drawn when he answered the door. *Id.* at 148. The officers testified that none of the agent's firearms were drawn. *Id.* at 21, 42, 80, 89.

Inspector Campos, the only Spanish-speaking officer present at the initial confrontation, translated for and spoke with Mr. Sanchez-Ceja during the encounter. *Id.* at 77-78. After Inspector Campos requested permission from Defendant, two agents—SA Patti and SA Williams—began a search of the house on Oates Drive. *Id.* at 82-85. While they conducted the search, Mr. Sanchez-

---

[1] According the testimony of SA Patti at the hearing, DPD Officer Dave Garcia arrived after the initial "knock and talk" at the Oates Drive residence. Hr'g Tr. 179-180.

Ceja remained on or near the front porch with Inspector Campos. *Id.* at 85. During the course of the search, agents found guns, cash, and a sweatshirt that one agent avers he saw Mr. Sanchez-Ceja wear during a period of surveillance. *See id.* at 28. Narcotics, however, were not found at the house on Oates Drive. *See id.*

Agents asked Mr. Sanchez-Ceja whether he knew about the Larry Drive residence and whether he would agree to let them search that house. *Id.* at 91. According to the officers, Mr. Sanchez-Ceja agreed to let them search this house and informed them that drugs were at the Larry Drive residence. *Id.* at 88. Agents handcuffed Mr. Sanchez-Ceja, placed him in a vehicle, and transported him to the Larry Drive residence, which was approximately one-half mile (one minute) from the house on Oates Drive. *See id.* at 90-92. Agents used a key that was in Defendant's possession to enter the Larry Drive house.[2] *See id.* at 92.

Mr. Sanchez-Ceja was handcuffed in the living room of the house while the search was conducted. *Id.* at 95. The house on Larry Drive had three bedrooms, one of which was locked. *Id.* at 39. Agents were able to locate the key to unlock the bedroom door and discovered it to be a methamphetamine conversion laboratory. *Id.* at 40. In this room, agents found approximately 244 grams of methamphetamine and drug paraphernalia. *Id.* According to the Government, agents also located approximately 1,086 grams of methamphetamine in the living room of the house and approximately 3,124 grams of heroin in a kitchen drawer of the house. Gov't's Resp. 4.

After the search, Mr. Sanchez-Ceja was placed in custody and advised of his *Miranda* rights. *See* Def.'s Mot. 8; Gov't's Resp. 4. Mr. Sanchez-Ceja stated that he understood his rights

---

[2] The record is unclear as to when officers retrieved the key to the house on Larry Drive from Defendant, but this is of no moment because, as the court determines below, he voluntarily consented to the search of that residence, and there is no evidence before the court that he changed his mind. Thus, this issue is of no consequence.

and that he had already told the agents everything he had to say. *See* Hr'g Tr. 118. Inspector Campos explained that the officer conducting the interrogation—who had recently arrived on the scene—wanted to ask him questions to write a report. *Id.* at 119. Mr. Sanchez-Ceja eventually agreed to proceed with the interview, *see id.* at 106, at which time officers began a formal interrogation. *Id.* at 103.

## II.     Defendant's Motion to Suppress and Supplemental Briefing

Mr. Sanchez-Ceja contends that, when agents knocked on the door of the house on Oates Drive, they confronted him with a show of force. Def.'s Mot. 2. According to him, one agent had his gun drawn until another agent asked him to put it down. Def.'s Suppl. Br. 5. Mr. Sanchez-Ceja answered the door shirtless and shoeless, and agents never informed him that he could dress himself. *Id.* at 2. They told him to come outside in an "even tone" such that he did not believe that he was free to refuse their invitation. *Id.* at 5. They were standing in front of him, blocking his access to the street, and he was not allowed back inside the residence after they arrived. *Id.* at 2. He testified that another agent, who later arrived on the scene, told him that they were going to have a canine agent search the house and, if something happened to the canine agent, they were going to "put attempted homicide charges on [him]." *Id.* at 5-6 (citing Hr'g Tr. 152). Accordingly, Mr. Sanchez-Ceja did not believe that he was free to refuse the search because of the threat of attempted homicide charges. Def.'s Suppl. Br. 6.

After the search, agents informed Defendant that they "found guns; cash; and a sweatshirt that one agent avers he saw Mr. Sanchez-Ceja wear during a period of surveillance" in the house on Oates Drive. Def. Mot. 2; Def.'s Suppl. Br. 6. They handcuffed and transported him to Larry Drive. Def.'s Suppl. Br. 6. He remained handcuffed and was placed in the living room as the agents searched Larry Drive. Def.'s Mot. 3. They did not read him his *Miranda* rights until after they found illegal drugs and concluded the search of Larry Drive. *See id.* at 6. Upon hearing his

**Memorandum Opinion and Order – Page 4**

rights, Mr. Sanchez-Ceja stated that he had already told the agents everything he had to say. *Id.* at 3. Inspector Campos explained that the agents needed him to repeat all of the statements he had made so that his colleague could write a report. Def.'s Suppl. Br. 16. Inspector Campos admitted to hearing Mr. Sanchez-Ceja say "no" to post-*Miranda* questioning, but he did not cease questioning.[3] *Id.* at 17. Ultimately, Mr. Sanchez-Ceja "provided a litany of incriminating statements." *Id.* at 12.

Defendant argues that consent to search Oates Drive was involuntary, given the allegedly coercive atmosphere created by the presence of multiple police officers dressed in tactical gear, visibly carrying guns, and blocking his access to the street. *Id.* at 13. Under these circumstances, he maintains that he did not freely consent to the search of either residence. *Id.* He also argues that there is no doubt that individuals placed in handcuffs and transported from one location to another are under arrest. *Id.* at 16-17. Mr. Sanchez-Ceja therefore argues that he did not make an intelligent waiver of his *Miranda* rights. *Id.* Moreover, he argues that, even if the reading of his *Miranda* rights were "unproblematic," he exercised his right to cut off questioning. *Id.*

### III. Government's Responses

The Government contends that, when law enforcement officers approached Oates Drive, their firearms were not drawn, and they conducted a lawful "knock and talk." Gov't's Resp. Suppl. 5. It also contends that, during the search, Mr. Sanchez-Ceja was not restrained. *See* Gov't's Resp. 17. Moreover, the officers ensured that Inspector Campos, who is fluent in Spanish, translated for and spoke to Mr. Sanchez-Ceja during the exchange and remained present with him at both

---

[3] To this point, the Government responds that "[b]ased on the totality of the circumstances from that day, [Inspector] Campos believed [Mr.] Sanchez-Ceja was initially confused, because he had been attempting to speak with law enforcement during the search of the Larry House."

residences in the event he made any requests. *Id.* at 7. According to the Government, the conversation with Inspector Campos was casual and calm. Gov't's Resp. Suppl. 6.

After narcotics were not found at Oates Drive, the agents questioned Mr. Sanchez-Ceja about the Larry Drive residence and whether he would consent to a search of that house. Gov't's Resp. 7. He confirmed that he knew about the house on Larry Drive, admitted that narcotics were there, and provided verbal consent for the agents to search that house. *Id.* He was then placed in handcuffs pursuant to DPD policy for transport to the house on Larry Drive. Gov't's Resp. Suppl. 7. He remained handcuffed and outside Larry Drive while the agents performed a protective sweep.[4] *Id.* After the sweep was conducted, he was brought inside the house and placed on a couch in the central area of the residence. *Id.* During the search, he was not interviewed and never revoked his previous voluntary consent. *Id.* at 7-8. He remained agreeable and tried to engage law enforcement in conversation but was cut off from doing so because he had not yet received his *Miranda* warnings. *Id.* at 8. When law enforcement came across a locked bedroom and asked Mr. Sanchez-Ceja whether he had access to that room and whether they could search it, he identified where the keys to the room were located and did not revoke consent to search that room, or ask that it not be searched. *Id.* In that bedroom, there was evidence of illegal drugs. *Id.*

At the conclusion of the search, Inspector Campos and another agent decided to interview Mr. Sanchez-Ceja and read him his *Miranda* warnings. *Id.* Throughout the day, based on his continued cooperation and consent and attempts to try to speak with law enforcement before

---

[4] "A 'protective sweep' is a quick and limited search of premises, *incident to an arrest* and conducted to protect the safety of police officers or others." *United States v. Silva*, 865 F.3d 238, 241 (5th Cir. 2017) (quoting *Maryland v. Buie*, 494 U.S. 325, 327 (1990)) (emphasis added). Therefore, the Government's contention that a "protective sweep" was performed when officers arrived at the Larry Drive residence is an acknowledgment that Mr. Sanchez-Ceja was in effect under arrest at that time. As the court determines below that Defendant consented to the search of the house on Larry Drive *prior* to his arrest, this has no bearing on its determination of the voluntariness of his consent.

having received his *Miranda* warnings, Inspector Campos believed Mr. Sanchez-Ceja did not fully understand that he was being provided an opportunity to speak to the police had he wanted to do so. *Id.* at 8-9. The Government contends that, after some initial confusion, he clearly stated that he did want to speak, and the interview commenced. *Id.* at 9. During the remainder of the interview, he never expressed that he did not want to speak with officers or that he was coerced to do so. *Id.*

The Government argues that Defendant voluntarily consented to the searches of the Oates Drive and Larry Drive houses and that he was not in a coercive environment that would render his consent involuntary. *See id.* at 15. It maintains that he provided voluntary statements, both before and after receiving *Miranda* warnings, because he was not in custody when making incriminating statements at Oates Drive and then knowingly and intentionally waived his *Miranda* rights at the house on Larry Drive. *Id.* at 16-17. It also maintains that he did not unambiguously invoke his right to remain silent.[5] *Id.* at 18.

## IV.   Applicable Law

Warrantless searches and seizures inside a person's home are presumptively unreasonable under the Fourth Amendment;[6] however, this presumption of unreasonableness may be rebutted

---

[5] Contrary to this argument by the Government, the Fifth Circuit "decline[d]" to address whether the standard requiring a defendant to unambiguously invoke the right to counsel should be applied to the right to remain silent. *Soffar v. Cockrell*, 300 F.3d 588, 594 n.5 (5th Cir. 2002). Therefore, this argument is without merit.

[6] The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

when the occupant gives valid consent to conduct the search or exigent circumstances exist to justify the intrusion. *See Steagald v. United States*, 451 U.S. 204, 211 (1981); *United States v. Richard*, 994 F.2d 244, 247 (5th Cir. 1993). Courts have recognized the "knock and talk" strategy, a noncustodial procedure whereby an officer identifies him or herself and asks to talk to the home occupant and then eventually requests permission to search the residence as a reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity. *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001) (citation omitted); *see also United States v. Zertuche-Tobias*, 953 F. Supp. 803, 829 (S.D. Tex. 1996) (citations omitted).

*Miranda* warnings must be administered prior to "custodial interrogation." *United States v. Bengivenga*, 845 F.2d 593, 595 (5th Cir. 1988) (en banc) (quoting *Miranda v. Arizona*, 384 U.S. 436, 479 (1966)). "A suspect is . . . 'in custody' for Miranda purposes when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree [that] the law associates with formal arrest." *Id.* at 596. If no formal arrest has been made, "'[t]wo discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave.'" *United States v. Cavazos*, 668 F.3d 190, 193 (5th Cir. 2012) (quoting *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011)). Moreover, statements made during the course of a "knock and talk" are admissible if the defendant was not "placed under formal arrest or a restraint tantamount to arrest." *United States v. Trejo*, 378 F. App'x 441, 449 (5th Cir. 2010) (citing *United States v. Chavez*, 281 F.3d 479, 486 (5th Cir. 2002); *Bengivenga*, 845 F.2d at 596).

The court must also determine whether Mr. Sanchez-Ceja voluntarily consented to the search of the Oates Drive and Larry Drive residences. Courts consider six primary factors to determine whether consent to a search is knowing and voluntary:

> (1) the voluntariness of the defendant's custodial status; (2) presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

*United States v. Guevara-Miranda*, 640 F. App'x 319, 320 (5th Cir. 2016) (quoting *United States v. Santiago*, 410 F.3d 193, 199 (5th Cir. 2005)). All six factors are relevant; however, no single factor is dispositive or controlling on the issue of voluntariness. *Id.* (citing *United States v. Tompkins*, 130 F.3d 117, 120 (5th Cir. 1997)). The question of whether a search was in fact "voluntary" is a question of fact to be determined from the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973).

Generally, a defendant who seeks to have evidence suppressed bears the burden of proving by a preponderance of the evidence that the evidence was seized illegally. *See United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005). When a search or seizure is conducted without a warrant, however, the Government has the burden to show that the search or seizure was constitutional. *Id.*; *United States v. Chavis*, 48 F.3d 871, 872 (5th Cir. 1995). It is undisputed that the searches conducted at the Oates Drive and Larry Drive residences on April 3, 2019, were done without a warrant. Accordingly, the Government bears the burden of proving by a preponderance of the evidence that the officers had reasonable suspicion to initiate and conduct the searches.

## V. Analysis

### A. "Knock and Talk" and Voluntary Consent to Searches

The parties do not dispute the legality of the "knock and talk" strategy in this case; however, they do dispute whether Mr. Sanchez-Ceja gave law enforcement officers *voluntary*

consent to search the residences. The initial issue before the court, therefore, is whether the officers conducted the "knock and talk" strategy at the Oates Drive residence with a "show of force," as Defendant contends, *see* Def. Mot. 2, rendering his consent involuntary. The court carefully reviewed all of the facts, evidence, and testimony of the witnesses. The determination of the voluntariness of Mr. Sanchez-Ceja's consent initially appeared to be a close call, but upon review of all the evidence, determination of the credibility of the witnesses, and consideration of the totality of the circumstances, the court determines that all but one of the six factors weigh in favor of finding that his consent for the initial search of the Oates Drive residence was knowing and voluntary.

The evidence establishes that law enforcement officers tracked Messrs. Garcia and Sanchez-Ceja to both the Oates Drive and Larry Drive residences as part of a narcotics investigation. As part of their crime-fighting responsibilities, the officers had a duty to conduct such an investigation based on credible information. After other officers conducted a traffic stop involving Mr. Garcia in a nearby alleyway, the officers conducted a "knock and talk" with Mr. Sanchez-Ceja at Oates Drive.

### 1. Voluntariness of Defendant's Custodial Status

The court must first consider whether Mr. Sanchez-Ceja was in custody at the time he consented to the searches of the Oates Drive and Larry Drive residence. An individual is "in custody" when formally placed under arrest or when a reasonable person—under the circumstances—would believe that his or her freedom to leave or move about is restrained constituting an arrest. *See Bengivenga*, 845 F.2d at 596. There is no dispute that Defendant was not under formal arrest when he allowed the officers to search the Oates Drive residence. The parties do dispute, however, whether Mr. Sanchez-Ceja was handcuffed and placed under arrest when he told officers that they could search the house on Larry Drive and informed them that

**Memorandum Opinion and Order – Page 10**

narcotics were located at that residence. The officers testified that Defendant was not handcuffed or under arrest when he consented to that search or told them about the narcotics, Hr'g Tr. 30, 88; however, Mr. Sanchez-Ceja testified that he was questioned about the drugs at the Larry Drive residence after he was handcuffed and placed under arrest. The court finds the testimony of the officers that he was not handcuffed or otherwise under arrest more credible than Defendant's conflicting testimony.[7] As such, the court determines that Mr. Sanchez-Ceja was not under formal arrest at that time, and it must now determine whether, under the circumstances, a reasonable person would understand the situation as a restraint on their freedom to leave or otherwise move about.

Mr. Sanchez-Ceja testified that he did not "feel free close the door" when officers initiated the "knock and talk" at the Oates Drive residence "because the agent who had his gun drawn scared

---

[7] In determining the credibility of each witness, the court considered all of the circumstances under which the witness testified, including: the interest, if any, the witness has in the outcome of the case; the witness's appearance, demeanor, and manner of testifying while on the witness stand; the witness's apparent candor and fairness, or the lack thereof; the reasonableness or unreasonableness of the witness's testimony; the opportunity of the witness to observe or acquire knowledge concerning the facts to which he testified; the extent to which the witness was contradicted or supported by other credible evidence; and whether such contradiction related to an important factor in the case or some minor or unimportant detail.

The court recognizes that, as the defendant in this case, Mr. Sanchez-Ceja has a significant interest in its outcome, and that the court's decision on his motion to suppress affects the outcome of this case. With respect to Mr. Sanchez-Ceja's appearance, demeanor, and manner of testifying, as well as his apparent candor and fairness, the court notes that Mr. Sanchez-Ceja was nervous, as many witnesses and defendants are when testifying in federal court; however, the court was left with the distinct impression that his answers did not tell the full story. Specifically, the court observed this with his hesitation in answering certain questions, and at times when he volunteered information that was not requested or even necessary. Also, at times he was argumentative. On the other hand, the court observed no inconsistencies on matters of importance to its decision from the testimony of the officers. None of the officers had anything of consequence to gain or lose by not being forthcoming in their testimony. Nothing in the record indicates to the court that Inspector Campos, the officer who initially spoke with Mr. Sanchez-Ceja, had any motive to lie or misstate facts to the court during his testimony. Of particular importance to the court was Inspector Campos's acknowledgment that he heard Mr. Sanchez-Ceja state "at least once" that he did not want to talk to officers after his *Miranda* rights were read at the Larry Drive residence. *See* Hr'g Tr. 118, 120. The court has had other cases in which testifying officers were less forthcoming or actually lied about the events of a search or arrest. As discussed below, Inspector Campos's tell-it-like-it-was testimony is the basis for the court's *Miranda* ruling.

[him]." Hr'g Tr. 148.  SA Patti and Inspector Campos testified that none of the officer had drawn their firearms. *Id.* at 42, 83-84.  The court finds the testimony of the officers that none of them had their gun drawn before or during the initial "knock and talk" more plausible than Mr. Sanchez-Ceja's testimony to the contrary.[8]  The evidence before the court does not support a finding that a reasonable person would have understood the situation as restraint constituting an arrest under the circumstance surrounding the officers' "knock and talk" at the Oates Drive residence or the subsequent questioning regarding the Larry Drive residence before they left Oates Drive.  Moreover, the evidence supports a finding that Defendant was not in a custodial setting when he offered information regarding the narcotics located at the house on Larry Drive and his consent to its search.  This factor, therefore, weighs against Defendant.

### 2. Presence of Coercive Police Procedures

The court now considers whether the officers used coercive procedures to gain Mr. Sanchez-Ceja's consent for the searches.  It is undisputed that at least three police officers confronted Mr. Sanchez-Ceja at his front door with their firearms *visible*, told him to come outside, and asked to search his house for narcotics or firearms while blocking his pathway to the street.  Defendant argues that, based on these facts, the court has ample evidence to determine that the officers created a coercive atmosphere.  At the hearing, SA Patti testified that, during the officers' questioning, Mr. Sanchez-Ceja was free to leave, although the officers did not inform him of such.  Hr'g Tr. 52.  SA Patti testified that, if Mr. Sanchez-Ceja wanted to ignore and walk past them to the street, they would have allowed him to do so.  *Id.*  After he agreed, Inspector Campos asked Mr. Sanchez-Ceja to "step outside with me while my partners search your house." *Id.* at 85.  He testified that the demeanor of the conversation was casual and non-aggressive. *Id.* at 25.

---

[8] *See supra* note 6.

Moreover, Mr. Sanchez-Ceja testified that the tone of the officers' voices "wasn't loud [and] wasn't soft." *Id.* at 148. From this testimony, the court concludes that the tone of Inspector Campos's voice was "even," which the court takes to mean that it was a neutral tone; that is, one that was neither harsh nor aggressive but direct and official.

      Defendant relies on the presence of at most four law enforcement officers, their visible firearms, and his testimony that one officer had firearm drawn when Mr. Sanchez-Ceja answered the door to support his motion to suppress evidence found as a result of the searches. The Fifth Circuit has "held consent to be voluntary even in the face of greater shows of force than the presence [] of *seven* officers, some in uniform and none with weapons drawn or displaying force beyond their presence in numbers." *United States v. Solis*, 299 F.3d 420, 438 (5th Cir. 2002) (citing *United States v. Gonzales*, 121 F.3d 928, 939 (5th Cir. 1997)) (emphasis added). Defendant testified that one of the agents had "his gun drawn in his hands" when he answered the door, then another officer "pointed or made a signal to the agent . . . [and] asked him to put it down." Hr'g Tr. 148. The officers testified that none of them had drawn their firearms. *Id.* at 42, 83-84. As previously discussed, the court finds the officers' testimony regarding this issue more credible than Mr. Sanchez-Ceja's testimony. Even accepting Defendant's testimony on this matter as true, it does not support his contention that the officers were coercive or confronted him with a show of force. If one officer instructed another officer to "put down" his weapon, as Defendant testified, this convinces the court that, overall, the officers did not intend to intimidate Mr. Sanchez-Ceja or create a coercive environment; or that a reasonable person would view the officers' presence as intimidating or coercive.

      Moreover, the evidence does not show that at any point during the "knock and talk" or subsequent search of Oates Drive was Defendant handcuffed or otherwise in custody. The court cannot rely solely on the presence of as many as four officers with visible firearms as sufficient

evidence to support a finding that the officers created a coercive environment or show of force that rendered Mr. Sanchez-Ceja's consent involuntary. As such, this factor also weighs against Defendant.

### 3. Defendant's Cooperation with Police Officers

The third factor involves the extent and level to which Mr. Sanchez-Ceja cooperated with the officers. As an initial matter, the record is clear that during and after the "knock and talk" Defendant cooperated with the officers by allowing them to conduct the requested search of the house on Oates Drive. After officers completed that search, they questioned Mr. Sanchez-Ceja about the Larry Drive residence. He confirmed that he knew about that house, agreed to a search of that residence, and informed the officers that narcotics were there. The evidence shows, therefore, that Mr. Sanchez-Ceja was cooperative throughout the day as to the searches. *See* Hr'g Tr. 43, 96, 122, and 170. As such, this factor weighs against Defendant.

### 4. Defendant's Awareness of His Right to Refuse Consent

The fourth factor concerns Mr. Sanchez-Ceja's awareness of his right to refuse consent. "While knowledge of the right to refuse consent is one factor in determining voluntariness, the failure to advise an individual of the right to withhold consent is not determinative in and of itself." *Solis*, 299 F.3d at 438. Moreover, "there is no absolute requirement that the [G]overnment establish that [Defendant] knew [he] could refuse; it is merely one of the factors." *United States v. Gonzales*, 79 F.3d 413, 421 (5th Cir. 1996) (citing *United States v. Cooper*, 43 F.3d 140, 148 (5th Cir. 1995)). As the Government concedes, "[t]here is no evidence that the agents informed the defendant that he could refuse to provide consent to search either residence." Gov't's Resp. 8. Furthermore, Defendant testified that he did not "feel free" to refuse consent. Hr'g Tr. 148. The

record is not clear that Mr. Sanchez-Ceja was aware of his right to refuse consent. Therefore, the court determines that this factor weighs in favor of Defendant.

### 5. Defendant's Education and Intelligence

With respect to the fifth factor, there is no evidence that Mr. Sanchez-Ceja's education or intelligence was such that he did not understand what was being requested, or the consequences of his consent. Although he testified that he only completed the sixth grade, Hr'g Tr. 125, there is no evidence before the court that Defendant lacked sufficient education or intelligence to voluntarily consent to either search. Moreover, Mr. Sanchez-Ceja's primary language is Spanish, *see id.* at 64; however, Inspector Campos communicated with him in Spanish and translated pertinent information regarding the search to him and the other officers. As there is no evidence that Defendant lacked the capacity to understand and appreciate the gravity of the situation, this factor weighs against Mr. Sanchez-Ceja.

### 6. Defendant's Belief that Incriminating Evidence Would Not Be Found Against Him

With respect to the sixth factor, the record is clear that officers did not find any narcotics during the search on Oates Drive. The court reasonably infers from the evidence that Mr. Sanchez-Ceja knew that no incriminating evidence would be found against him at the Oates Drive residence, which supports a determination that his consent was voluntary. In other words, it is reasonable to infer that Mr. Sanchez-Ceja gave consent based on the totality of the circumstances because he knew no narcotics were present at the time the search took place; and, therefore, he had nothing to lose by a search of the residence on Oates Drive.

Regarding the Larry Drive residence, the record is clear that Defendant knew that the officers would find incriminating evidence there. Significantly, Mr. Sanchez-Ceja informed officers that narcotics were located inside the house on Larry Drive before they left the Oates Drive

residence. Although some of the narcotics were found in a locked room inside that house, SA Patti testified that the officers found "a box in [the] living room that contained an additional kilogram of methamphetamine" that was "open in plain sight." Hr'g Tr. 40. Additionally, Inspector Campos testified that after he told Mr. Sanchez-Ceja "that we followed him from the Larry address," he "gave me the look of like surprise. His eyes opened up, and I then told him in Spanish, we are not here out of the clear blue sky. We have information of what's going on." Hr'g Tr. 88. Inspector Campos also testified that Defendant then confirmed that narcotics were present at the house on Larry Drive. *Id.* This tells the court that Mr. Sanchez-Ceja realized the scope of the investigation and that officers were aware of his possible or likely involvement in drug trafficking. The evidence thus supports a finding that he knew the officers—through a warrant or further investigation—would more likely than not find incriminating evidence at the Larry Drive residence. As such, the court determines that this factor weighs against Defendant. Even if this factor weighs in favor of Mr. Sanchez-Ceja with respect to the residence on Larry Drive, four of them weigh against him.

Considering the totality of the circumstances, the court determines that five of the six factors weigh in favor of finding that Defendant's consent to search the Oates Drive and Larry Drive residences was knowing and voluntary. The evidence in the record does not support Mr. Sanchez-Ceja's contention that his consent was coerced or involuntary.[9] Further, nothing in the record establishes or indicates that Mr. Sanchez-Ceja ever revoked his consent to search either residence. Having concluded that consent to the searches was voluntary, the court further determines that there was nothing illegal about the "knock and talk" or the subsequent searches.

---

[9] As the court determined above, the evidence before it and its credibility determinations support a finding that Mr. Sanchez-Ceja was handcuffed *after* he consented to the searches of both residences and informed officers that narcotics were present at the Larry Drive house. As such, the court further determines that this evidence supports findings that (1) his consent to both searches was voluntary and (2) the evidence found during the searches should not be suppressed.

### B. Voluntariness of Incriminating Statements

Mr. Sanchez-Ceja contends that his pre-*Miranda* statements should be suppressed because he was in custody when they were made, and his post-*Miranda* statements should be suppressed as he did not make an intelligent waiver of his *Miranda* rights. As previously discussed, a defendant is in custody for *Miranda* purposes when he or she is "placed under formal arrest or a restraint tantamount to arrest." *Trejo*, 378 F. App'x at 449. As the court has determined above that Defendant was not in a custodial setting[10] when he consented to the search of the Oates Drive residence, it follows that the statements he made there—including those concerning narcotics at the house on Larry Drive—were not custodial statements and were made voluntarily. Therefore, those pre-*Miranda* statements will not be suppressed.[11]

With respect to his post-*Miranda* statements made after officers completed the Larry Drive search, the evidence shows that Mr. Sanchez-Ceja did not knowingly and intentionally waive his *Miranda* rights, specifically his right to remain silent. Defendant argues that he exercised his right to cut off questioning, but officers continued to question him. Stated differently, he contends that his right to remain silent was violated. "Once warnings are given, if a suspect 'indicates *in any manner, at any time* prior to or during questioning, that he wishes to remain silent, the interrogation must cease.'" *Cockrell*, 300 F.3d at 593 (quoting *Miranda*, 384 U.S. at 473-74) (emphasis added). Moreover, police must "scrupulously honor[]" a suspect's right to cut off questioning. *See id.* (quoting *Michigan v. Mosley*, 423 U.S. 96, 104 (1975)). At the hearing, Inspector Campos testified

---

[10] Stated differently, Mr. Sanchez-Ceja was not under formal arrest or restraint tantamount to arrest.

[11] As the court determines that Mr. Sanchez-Ceja's pre-*Miranda* statements were not improperly obtained, it need not employ the two-step analysis under *Missouri v. Seibert*, 542 U.S. 600 (2004), to determine the admissibility of his post-*Miranda* statements. *See United States v. Nunez–Sanchez*, 478 F.3d 663, 668 (5th Cir. 2007).

**Memorandum Opinion and Order – Page 17**

that "at least once" he heard Mr. Sanchez-Ceja say "no" to speaking with officers after he read Defendant the *Miranda* warnings. Mr. Sanchez-Ceja asserts that this fact supports his contention that his right to end the interview was violated. The court agrees.

The Government contends, however, that "Inspector Campos believed [Mr.] Sanchez-Ceja was initially confused, because he had been attempting to speak with law enforcement during the search of the Larry House."[12] Gov't's Resp. Suppl. 18. According to the Government, "[t]he confusion is evidenced when at one point during the conversation, [Mr.] Sanchez-Ceja says 'Okay. That's fine,' about talking to law enforcement, but then says 'No.'" *Id.* The court is not persuaded by the Government's argument on these facts. While there may have been some confusion between Inspector Campos and Mr. Sanchez-Ceja, Inspector Campos's testimony was clear and unequivocal: after the *Miranda* warnings were read, he heard Defendant say—on *at least* one occasion—that he did not wish to speak with the officers. Hr'g Tr. 118, 120. Once Mr. Sanchez-Ceja made such statement, officers should have "'scrupulously honored' his right to cut off questioning," *Cockrell*, 300 F.3d at 593 (quoting *Mosley*, 423 U.S. at 104), and the officers were obligated to cease any interrogation of Mr. Sanchez-Ceja forthwith. As they did not, the court finds that Defendant's right to remain silent—or cut off interrogation—was violated. Accordingly, the court determines that Mr. Sanchez-Ceja's post-*Miranda* statements will be suppressed.

---

[12] According to Inspector Campos:

> He was cooperative, very friendly, trying to talk to us while we were doing the search and stuff. At least on one occasion, I had to tell him, "Hey, hold on. We are not going to talk to you yet. You will have that opportunity. Let us just finish what we are doing, and we will go from there."

Hr'g Tr. 96.

## VI. Conclusion

For the reasons herein stated, the court **determines** that Defendant voluntarily consented to the searches of the Oates Drive and Larry Drive residences; his pre-*Miranda* statements were not made in a custodial setting; and his post-*Miranda* statements were made in violation of his right to remain silent. Accordingly, the court **denies in part** and **grants in part** Defendant Juan Carlos Sanchez-Ceja's Motion to Suppress (Doc. 93); and, **suppresses** any and all post-*Miranda* statements made by Defendant at the Larry Drive residence on April 3, 2019, and **prohibits** the Government from using any such statements to prosecute Mr. Sanchez-Ceja.

**It is so ordered** this 11th day of January, 2022.

_/s/ Sam A. Lindsay_
Sam A. Lindsay
United States District Judge